Salvador GONZALES, Petitioner,

v.

Dr. George J. BETO, Director, Texas Department of Corrections, Respondent.

Civ. A. No. 66–62–A.

United States District Court
W. D. Texas,
Austin Division.

March 8, 1967.

Joel J. Finer, Austin, Tex., by appointment of the Court, for petitioner.

Crawford C. Martin, Atty. Gen. of Texas, Ronald E. Luna, Asst. Atty. Gen. of Texas, Austin, Tex., for respondent.

## MEMORANDUM AND ORDER

ROBERTS, District Judge.

Petition for the Writ of Habeas Corpus. Title 28 U.S.C. Sections 2241–2255 (1964).

Petitioner is serving a 14 year State sentence from the District Court of Travis County, Texas, for "Illegal Possession of Narcotics" (heroin), imposed on September 8, 1964. He was represented by trial counsel and appellate counsel. His appeal resulted in an affirmance by the Texas Court of Criminal Appeals, Gonzales v. State of Texas, 389 S.W.2d 306 (1965). The United States Supreme Court denied certiorari January 17, 1966, 382 U.S. 992, 86 S.Ct. 570, 15 L.Ed.2d 478.

The petition alleges illegal detention of the petitioner on several grounds, only one of which will be treated here. The issue which this Court deems dispositive of this application relates to the legality of the search and seizure by

which the heroin and related paraphernalia used to convict petitioner were obtained. A brief statement of the facts and testimony will suffice for our purposes.

On June 27, 1964, at 8 P.M. (after dark) Lieutenant Harvey Gann of the Austin, Texas Police Force, armed with an admittedly invalid search warrant, summoned three police officers and an agent of the Liquor Control Board of Texas, to 206 Elkhart Street after obtaining permission to use those premises to set up a surveillance of the residence immediately to the north, at 208 Elkhart Street, where petitioner was a guest. (T. 3)

The purpose of the police, and the nature and extent of their reason to believe a crime was being committed is indicated by Lt. Gann's testimony that "We had information that narcotics were being peddled there and we intended to raid the place and ascertain if narcotics were there," and that "I had received information on Louis Selvera, the occupant of the house, that he had that day retrieved from the area, 'the alley across the street', a small package which he had picked up and taken inside the house." (T. 54) On cross-examination, before the jury, Lt. Gann offered, without elaboration and for the first time, the statement that Selvera had two weeks preceding the raid, "admitted" to Gann that he was a narcotics user. (T. 74)

The District Attorney, Mr. Blackwell, stipulated at trial "that the search warrant does come directly under the Supreme Court case [Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964)] * * *." Lt. Gann's testimony suggests that the search was predicated on his belief in the validity of the warrant, for when asked whether he had permission or any other authority to go on the property of 208 Elkhart, he replied: "I did have a search warrant." (T. 71) Prior to the night of the raid, the police had had 208 Elkhart Street under surveillance for about one month. (T. 13)

At about 8 P.M., Lt. Gann saw Louis Selvera pull into his driveway and enter his house. Twenty or thirty minutes later, Lt. Gann crossed onto the property of 208 Elkhart, peered through a window on the south side, saw nothing, proceeded around the back yard to a window on the northwest side of the house, and slipped up very close to the window and looked in. (T. 8) After observing three pairs of apparently male legs seated around a table, and concluding that the men were either eating or capping heroin from the noise they were making, he returned to the back porch next door. (T. 22)

Twenty or thirty minutes later, Lt. Gann returned to the same window at 208 Elkhart. (T. 29) After about ten minutes, he was able to see the top of the table through a gap in the curtains caused by a gentle breeze. He saw a box marked powdered sugar and a gelatin capsule box and concluded that the men were capping heroin. (T. 31–35) Lt. Gann then returned to 206 Elkhart and took Sergeants Wisian and Moody and Liquor Agent Burns out to the garage of Selvera's residence.

While Moody and Burns remained in hiding in Selvera's garage, Gann and Wisian proceeded across Selvera's yard to another window, on the north side of Selvera's residence. Sergeant Wisian testified that on the way he looked through the rear window and saw three males seated at a table whom he was unable to identify. (T. 114) Lt. Gann stood up on a drainpipe protruding from the house and raised himself so he could see into the north window. He saw a woman entering the room and three men seated around a table with knives in their hands, working with a white powder in a plate. When the woman approached the window, Gann ducked down, then climbed up again to get a better look. (T. 38–40)

Lt. Gann and Sgt. Wisian returned to Selvera's garage and Gann assigned positions for the raid. Gann and Wisian went to the back (west) door, "hollered police and hit the door," breaking it

down, and after a short skirmish, arrested petitioner and the others and seized the heroin and narcotics paraphernalia. (T. 41, 80) Petitioner objected to all the evidence obtained as a result of peering through the windows and breaking into the house, as the product of an unreasonable search and seizure, but his motion to exclude such evidence was denied. (T. 45)

Lt. Gann related to the jury what he had seen and heard while peering through the window. On his last viewing, he observed petitioner, whom he had known for two or three years and identified in court, seated with others around a table on which there were knives, powdered sugar, gelatin capsules, and heroin. Lt. Gann described the narcotics paraphernalia which were seized after the officers entered the house and explained the function of several of these items in the production of heroin capsules. (T. 54, 56, 62)

Lt. Gann described petitioner's appearance at the time of arrest as "very relaxed * * * his eyes were bright and shiney [sic] with the, unable to discern any pupils in his eyes at all. [sic] He had numerous needle marks on his arms * * * And he was very groggy appearing. He didn't have anything to say and moved about very little." (T. 64)

Lt. Gann testified that in his opinion as an experienced vice officer, petitioner and one of his companions were under the influence of drugs.

■ The remaining testimony substantiated that it was in fact heroin the men were working with at the table. In addition, petitioner called as a hostile witness Mr. Burns, the Texas Liquor Control Board agent who was working with the vice squad officers the night of the raid. Mr. Burns testified that he entered the front door, grabbed petitioner coming out of a bedroom and handcuffed him. Petitioner did not put up much of a scuffle. (T. 161) When asked by defense counsel whether he had occasion to go into the kitchen, Burns responded, "Yes sir, I saw all the stuff laying on the kitchen table." This answer was at best unresponsive, and did not place petitioner in any contact with or in possession of the heroin. In the opinion of this Court, petitioner's trial counsel could not reasonably be charged with foreseeing this answer, and can hardly be deemed to have waived his objections to the introduction of the evidence merely by calling Burns to the stand.

■ In addition, the Court feels there can be no doubt that petitioner had standing to raise the question of the validity of the search and seizure under Jones v. United States, 362 U.S. 257, 80 S.Ct. 725, 4 L.Ed.2d 697 (1960).

[3] Since Mapp v. Ohio, 367 U.S. 643, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961), or at least since Ker v. State of California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726 (1963), the same standards of reasonableness of a search or seizure apply to the States through the Fourteenth Amendment that apply to the federal government by virtue of the Fourth Amendment. The due process clause of the Fourteenth Amendment is the vehicle of this application. Accordingly, this Court may look to cases decided by the federal courts, including of course, the Supreme Court and the Fifth Circuit Court of Appeals, as authority for the permissible limits of a State search and seizure.

The cases dealing with searches involving physical trespasses on land or other property are not uniform. However, there is a common thread in many of them to the effect that a mere physical trespass on land will not vitiate a search otherwise valid. Or, as it is sometimes stated, the protection of the Fourth Amendment does not extend to open fields. Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924); United States v. Young, 322 F.2d 443 (4th Cir. 1963); United States v. Sorce, 325 F.2d 84 (7th Cir. 1963); Monnette v. United States, 299 F.2d 847 (5th Cir. 1962); United States v. Benson, 299 F.2d 45 (6th Cir. 1962); United States v. Potts, 297 F.2d 68 (6th

Cir. 1961); Hodges v. United States, 243 F.2d 281 (5th Cir. 1957); Martin v. United States, 155 F.2d 503 (5th Cir. 1946). Nor to unoccupied buildings. United States v. Romano, 330 F.2d 566 (2d Cir. 1964).

Similarly, most of the cases dealing with this problem assume, either tacitly or explicitly, that the protection of the Fourth Amendment is co-extensive with the area around a residence or cluster of residential buildings known at common law as the curtilage. This apparently stems from Justice Holmes' adoption of this position in Hester v. United States, 265 U.S. 57, 59, 44 S.Ct. 445 (1924). While it may be questionable whether the application of constitutional safeguards should turn on niceties of ancient English property law, see Jones v. United States, 362 U.S. 257, 262, 80 S.Ct. 725 (1960), still, the question of physical invasion does bear a reasonable relation to the problem of invasion of privacy. Silverman v. United States, 365 U.S. 505, 510–511, 81 S.Ct. 679, 5 L.Ed.2d 734 (1960). As was stated in Brock v. United States, 223 F.2d 681, at 685 (5th Cir. 1955): "Whatever quibbles there may be as to where the curtilage begins and ends, clear it is that standing on a man's premises and looking in his bedroom window is a violation of his 'right to be let alone' as guaranteed by the Fourth Amendment." See also People of State of California v. Hurst, 325 F.2d 891 (9th Cir. 1963).

It is clear that the repeated trespasses close to the Selvera residence by Lt. Gann and others, as well as the peering into the windows were invasions of the "curtilage". On this ground alone, there is ample authority that information obtained by these methods cannot form the basis of a valid arrest and search incident thereto. United States v. Mullin, 329 F.2d 295 (4th Cir. 1964); Weaver v. United States, 295 F.2d 360 (5th Cir. 1961); Polk v. United States, 291 F.2d 230 (9th Cir. 1961); Hobson v. United States, 226 F.2d 890 (8th Cir. 1955); Walker v. United States, 225 F.2d 447 (5th Cir. 1955); Roberson v. United States, 165 F.2d 752 (6th Cir. 1948). But also, more importantly perhaps, these trespasses involved the invasion of privacy of occupants of an inhabited dwelling house. In Agnello v. United States, 269 U.S. 20, at 32, 46 S.Ct. 4, at 6, 70 L.Ed. 145 (1925), it was said:

The search of a private dwelling without a warrant is in itself unreasonable and abhorrent to our laws. * * * Save in certain cases as incident to arrest, there is no sanction in the decisions of the courts, federal or state, for the search of a private dwelling house without a warrant. * * * Belief, however well founded, that an article sought is concealed in a dwelling house, furnishes no justification for search of that place without a warrant. And such searches are held unlawful notwithstanding facts unquestionably showing probable cause.

Respondent's argument that this search and seizure may be sustained as incident to a lawful arrest fails for several reasons. First, it presumes that no search took place until grounds for arrest existed. Second, it presumes that valid grounds for arrest did exist. This Court cannot seriously entertain the argument that Lt. Gann's peering into the Selvera residence did not constitute a search. People of State of California v. Hurst, 325 F.2d 891 (9th Cir. 1963); Brock v. United States, 223 F.2d 681 (5th Cir. 1955). Neither can it be true that an officer may arrest a person committing a felony in his presence irrespective of whose privacy the officer must violate in order to place the commission of the felony in his presence. Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1947). See also United States v. Lewis, 227 F.Supp. 433 (S.D.N.Y.1964). None of the exceptional circumstances mentioned in *Johnson*, above, at page 15, 68 S.Ct. 367, as justifying on rare occasion the search of a private dwelling without a warrant, existed here.

It is perhaps worthwhile to note that this case could also raise a serious prob-

lem under Miller v. United States, 357 U.S. 301, 78 S.Ct. 1190, 2 L.Ed.2d 1332 (1958), because of the conduct of the officers in breaking down the door. However, because of the Court's decision on the above question, it is not necessary to discuss or decide this point.

Since in the opinion of this Court the petitioner was convicted on the basis of evidence obtained in violation of his constitutional rights, his application will be granted. Issuance of the writ and accordant discharge will be stayed for ninety (90) days to allow the State to re-try petitioner, if it so chooses, or to seek relief on appeal.