UNITED STATES of America

v.

John R. JAMES, Jr., Appellant.

No. 76–1432.

United States Court of Appeals,
District of Columbia Circuit.

Argued Nov. 19, 1976.

Decided April 7, 1977.

Edward Riehl *, with whom Michael E. Geltner, New York City (appointed by this court) was on the brief, for appellant.

Mary Ellen Abrecht, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Albert H. Turkus and Edward C. McGuire, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before DANAHER, Senior Circuit Judge, and TAMM and ROBINSON, Circuit Judges.

Opinion for the Court filed by SPOTTS-WOOD W. ROBINSON, III, Circuit Judge.

SPOTTSWOOD W. ROBINSON, III, Circuit Judge:

John R. James Jr., challenges several evidentiary rulings in the wake of which he was convicted of possessing a controlled substance with intent to distribute.[1] His effort to exclude heroin seized from his jacket strikes us as misplaced,[2] but we agree that the lurid circumstances of his arrest were improperly placed before the jury.[3] Since we cannot characterize this error as harmless, we reverse the conviction and remand the case for a new trial.

## I

Application of the law to this case must needs rest on the ramiform and occasionally conflicting evidence adduced at James' trial.[4] Testimony by District of Columbia police officers Green and McMasters was substantially as follows. Late on the evening of November 4, 1975, while they were on "old clothes" detail, a passing 1961 Plymouth bearing taxicab markings excited their interest. In their unmarked cruiser, the officers followed the Plymouth until it came to a halt, whereupon they pulled alongside. The officers alighted, as did the Plymouth's two occupants, and one—James—was perceived as making what was described at trial as "a throw-a-way gesture"[5] towards a nearby hedgerow.

James and his companion, Clennon Burke, were asked to and did identify themselves.[6] At this point, so the officers testified, James abruptly volunteered that he had no "dope," and in an apparent effort to convince displayed to them the contents of the glove compartment, ash tray and trunk of the Plymouth. Not content with this exhibition, James opened his jacket, then doffed it, but as he did the officers heard it brush the car with the clang of metal on metal. Officer McMasters testified that he asked James whether that signified a gun in the jacket; James replied in the negative and requested the officer to satisfy himself on that score. McMasters stated that he searched the coat and found various tools for narcotics distribution[7] but, as these carried no trace of contraband, they were, after some discussion of James' intentions,[8] replaced in the jacket. James and Burke went their way on foot.

The officers' suspicions thus alerted, they reboarded their cruiser and embarked, but with doused lights circled back to take up a

---

* Entered an appearance as student counsel pursuant to Rule 20 of the General Rules of this court.

1. 21 U.S.C. § 841(a) (1970).

2. U.S.Const. amend. IV. See Part II *infra*.

3. See Part III *infra*.

4. See, e. g., *United States v. Collins*, 142 U.S. App. 100, 102, 439 F.2d 610, 612 (1971).

5. Transcript (Tr.) III/188.

6. As it happened, Burke, the driver, had no operator's license in his possession and the Plymouth, though registered to James, carried a "dead sticker" and so could not legally be driven. A check with the police computer revealed that a valid license had been issued Burke and that no warrants for either were outstanding.

7. A tea strainer, several measuring spoons and thirteen snippets of tinfoil.

8. The officers testified at the suppression hearing that James had contemplated a ruse on some local narcotics purveyors. Officer McMasters is said to have suggested that such a course of action might place James in harm's way, and to have expressed the fervent desire that James carry out his plan, if at all, on someone else's beat.

covert position for surveillance. They said that they then saw James and Burke drop behind the hedgerow and retrieve two silver objects, which James put in his jacket. With this, the officers set off, but as the cruiser approached James removed his jacket, balled it up and, as the officers watched, tucked it under the arm of William Giles, James' elderly uncle, who had suddenly appeared on the scene. The officers immediately addressed Giles, who unhesitatingly surrendered the garment to them just as James and Burke entered the nearby house of James' aunt, Giles' sister. When the bundle unraveled, revealing two tinfoil packets, the officers gave chase, entering the aunt's house only to find that James and Burke had exited at the rear.

Certain particulars of the officers' version were vigorously disputed by James and Burke, both of whom testified. They recalled no mention of narcotics in their meeting with the officers,[9] claimed that the car search was permitted only upon demand and contended that no paraphernalia of any kind came to light. James denied any "throw-a-way" motion and both explained that the objects retrieved from the hedge were cigarette packs which, while the police were doubling back, had been tossed by Burke and fumbled by James.[10] The defense theory was, essentially, that the narcotics paraphernalia taken from James' jacket, as well as a brown powder containing heroin which was found in the tinfoil packets, were "planted" in the jacket after James had given up possession.[11]

## II

The appropriation of the jacket by the officers and their subsequent examination of its contents occasioned a motion to suppress,[12] from the failure of which James appeals. He concedes [13] that probable cause to search the jacket had matured by the time it was seized but contends that the search was invalid "because the police acted without a warrant." [14] Thus our question is "whether the police action was reasonable under all the circumstances," [15] and we have no difficulty in finding it so.

The warrantless search could have been sustained had James been apprehended while still wearing the jacket,[16] or had James flung it on the pavement.[17]

9. Rather, they claimed that the officers questioned them about a recent robbery.

10. The necessity of so doing was rationalized by their parting ways during the period in which the police were absent—Burke to a store for the cigarettes, and James to talk to Giles.

11. Some suspicion was cast Giles' way by the defense, but in its view the real culprits were the officers, one of whom was quoted by James as saying he "got [*sic*] to give it [the offense] to somebody." Tr. IV/7.

12. Cf. *Simmons v. United States,* 390 U.S. 377, 390, 88 S.Ct. 967, 974, 19 L.Ed.2d 1247, 1256–1257 (1968) to support James' standing.

13. Brief for Appellant at 40. The question of Giles' consent to the seizure was raised in the District Court, which made no finding on the issue. See *United States v. James,* Crim. No. 75–862 (memorandum opinion D.D.C. Mar. 18, 1976) (unreported). We likewise decline to predicate our decision on such consent as Giles might have given. See generally *Bumper v. North Carolina,* 391 U.S. 543, 548–549, 88 S.Ct. 1788, 1791–1792, 20 L.Ed.2d 797, 820 (1968). Neither do we sustain the search on grounds that James abandoned his jacket, *cf. e. g., Kein-*ingham v. United States, 113 U.S.App.D.C. 295, 307 F.2d 632 (1962), *cert. denied,* 371 U.S. 948, 83 S.Ct. 502, 9 L.Ed.2d 497 (1963); *Brown v. United States,* 261 A.2d 834, 835 (D.C.App. 1970), as the Government fleetingly suggests. Brief for Appellee at 18.

14. Brief for Appellants at 40.

15. *United States v. Johnson,* No. 73–2221 (D.C. Cir. *en banc* Jan. 12, 1977), at 18–19 n.10.

16. Compare *United States v. Santana,* 427 U.S. 38, 42–43, 96 S.Ct. 2406, 2409–2410, 49 L.Ed.2d 300, 305 (1976); *Warden v. Hayden,* 387 U.S. 294, 298, 87 S.Ct. 1642, 1645, 18 L.Ed.2d 782, 787 (1967), with *United States v. Robinson,* 414 U.S. 218, 236, 94 S.Ct. 467, 477, 38 L.Ed.2d 427, 441 (1973); *United States v. Brown,* 150 U.S. App.D.C. 113, 114, 463 F.2d 949, 950 (1972); *Bailey v. United States,* 128 U.S.App.D.C. 354, 357, 389 F.2d 305, 308 (1967). See also *United States v. Purry,* 178 U.S.App.D.C. 139, 142, 545 F.2d 217, 220 (1976).

17. See *Keiningham v. United States, supra* note 13; *Brown v. United States, supra* note 13. See also *Kleinbart v. United States,* 142 U.S. App.D.C. 1, 3, 439 F.2d 511, 513 (1970).

That the jacket had instead been passed on to Giles, who could have been either a dupe or a confederate, did not alter the need for swift action. In either event the officers, who had observed the transfer of the jacket, had ample grounds for suspecting that it contained evidence "peculiarly vulnerable to speedy and easily accomplished destruction,"[18] and it was at the very least their duty to forestall that possibility. Moreover, seizure of the jacket, easily accomplished as it was,[19] was far less intrusive than immobilizing Giles until a warrant could be secured. It was the more reasonable in light of James' retreat, since the officers could thereby ascertain readily whether the game was worth the candle[20] and, if so, give chase.

■ We find no fault with the course of action resulting in the seizure, and its fruits were properly admitted at trial. Had there been no more to this case, the officers' testimony concerning their initial encounter with and observation of James, taken together with the evidence we hold to have been legally seized, would readily have required affirmance of the convictions. Yet the Government did not content itself with that evidentiary presentation, but spread before the jury the debilitating and potentially prejudicial circumstances of James' subsequent arrest. To the consequences of that course of action we now turn.

18. *United States v. Johnson, supra* note 15, at 24.

19. We express no view as to whether the seizure might have been reasonable had Giles resisted, or whether, indeed, had it been Giles who complained the same result would obtain. See generally *Dorman v. United States,* 140 U.S.App.D.C. 313, 435 F.2d 385 (1971).

20. *Cf. United States v. Robinson,* 174 U.S.App.D.C. 351, 358, 533 F.2d 578, 585 (1976).

21. Tr. III/52.

22. *Id.*

23. As nearly as can be reconstructed the notations were:
 $990.0 6 SP 100. 13—Q—30.
 –350. SID 2 SP + 5Q
 640 3 4 SP + 8Q
 *Cf.* Tr. III/38 with *id.* IV/12–14 and *id.* IV/27–30.

## III

James was arrested in a drug raid on November 20, 1975, sixteen days after the events on which the indictment here was based. A squadron of police officers, confidentially informed that a cadre of supposedly armed citizens were gathering for a narcotics transaction, converged on an apartment, identified themselves, rushed through the door, and recovered a cache of contraband and a brace of weapons. James and another man, described at trial as "wanted by the FBI and U.S. Marshall's [*sic*] Office,"[21] jumped out a third floor window into the arms of police, followed—through the window—by "a quantity of heroin and other drugs and a pistol."[22] Burke was also apprehended in the raid.

In James' pocket when he was arrested was a slip of paper bearing cryptic notations.[23] The Government introduced the slip at trial, but did not immediately undertake to explain how, if at all, it was probative of the offense with which James was charged. On cross-examination of Officer McMasters, however, defense counsel adduced from him his interpretation of the notations,[24] which in his estimation detailed a narcotics transaction.[25] When defense counsel asked McMasters whether the symbols "[c]ouldn't mean anything else," he replied that "[t]here were a lot of other cir-

24. Defense counsel stated this was done to avoid such strategic advantage as the prosecution might have gained by introducing the interpretation on rebuttal, thereby having the last word on the subject.

25. The officer, who had previously been qualified as an expert in narcotics distribution, translated "SP" as "spoons," "Q" as "quarter spoons," and opined that "SID" was a man's name; he later testified, albeit haltingly, that one of those arrested with James was named Sidney. James was later to testify that the notations were data related to an estimate for a housepainting contract, and that the same symbols meant "supplying paint," "quarts" and "sanding interior doors," respectively; and to explain in some detail how these variables affected the bid he claimed to have roughed out on that sheet.

cumstances surrounding the receipt of this piece of paper." [26] This exchange was seen by the trial judge as "opening the door" for the prosecution's elicitation on redirect examination of a detailed account of the November 20 raid, which appears in the margin,[27] "because of the fact that the officer was questioned as to the meaning of the slip of paper. . . . He is entitled to take into consideration in making his evaluation of what was on that paper the surrounding circumstances. . . ." [28] Parts of the officer's account were later repeated in rebuttal of James' version of the November 20 raid.[29]

James claims that admission of the extensive testimony regarding the circumstances of his arrest was error. This is disputed by the Government, which contends also that, assuming *arguendo* the theoretical inadmissibility of Officer McMasters' narration, defense counsel "opened the door" to it by his inquiry into the meaning of the note—the position to which the trial judge subscribed.[30] Speaking first to that narrower issue, we disagree that McMasters' reportage was invited by defense counsel. Ordinarily, evidence inadmissible to prove the case-in-chief is rendered admissible only if "the defendant himself introduces the evidence or is in some manner estopped from objecting to its use." [31] A defendant may not, for instance, deny that he had ever possessed narcotics, or make similarly sweeping claims going "beyond a mere denial of complicity in the crimes of which he was charged",[32] without running the risk that "bad acts" testimony [33] or even illegally-obtained evidence [34] will be introduced in rebuttal. After all, "[t]he price a defendant must pay for attempting to prove his good name is to throw open the entire subject which the law has kept closed for his benefit and to make himself vulnerable where the law otherwise shields him." [35]

**26.** Tr. III/39.

**27.** "On November 20, 1975 the United States Marshall's [*sic*] Office received information there was an Apartment 145 Ivanhoe Street, Southwest where a large quantity of heroin was in the process of being cut. They also received information there were five men and two women in the apartment. The apartment belonged to the two ladies. There were also five guns in the apartment. Between eight and ten o'clock in the evening myself and Officer Bruce Wilson of the Metropolitan Police Department and approximately eight or nine other policemen surrounded the building with shotguns, canine dogs and U.S. Marshall's [*sic*] Office personnel. Subsequently we went to the door, knocked on the door and as we were knocking on the door the toilet flushed three different times and two men jumped out the third floor window of the building. Those two men, one being Mr. John R. James, Jr. and the other man named Norman Fitzgerald wanted by the FBI and U.S. Marshall's [*sic*] Office. As they came out the window a quantity of heroin and other drugs and a pistol came out the third floor window with them. They were apprehended on the ground in the rear of the building. We gained entrance to the apartment and also additionally recovered almost approximately $1,000 in drugs and arrested the other people in the apartment and recovered all the weapons." Tr. III/52.

**28.** *Id.* at 54–55.

**29.** Tr. IV/47–50. McMasters also testified that Burke, an important defense witness, was also arrested in the November 20 raid, and as well gave the description of James' fellow defenestratee as a wanted man, see text *supra* at note 21 and note 27 *supra*. The latter evidence is alleged to be improper, but in view of our disposition we need not reach that question.

**30.** Tr. III/50–51.

**31.** *Johnson v. United States,* 120 U.S.App.D.C. 69, 70, 344 F.2d 163, 164 (1964).

**32.** *Walder v. United States,* 347 U.S. 62, 65, 74 S.Ct. 354, 356, 98 L.Ed. 503, 507 (1954).

**33.** Cf. *United States v. Washington,* 150 U.S. App.D.C. 68, 70, 463 F.2d 904, 906 (1972); *Felton v. United States,* 83 U.S.App.D.C. 277, 279, 170 F.2d 153, 155, *cert. denied,* 335 U.S. 831, 69 S.Ct. 18, 93 L.Ed. 385 (1948); *United States v. Gonzalez,* 491 F.2d 1202, 1204 (5th Cir. 1974). See also *United States v. Lewis,* 157 U.S.App. D.C. 43, 49–50, 482 F.2d 632, 638–639 (1973). See generally C. McCormick, Evidence § 58 at 132 n. 7 (E. Cleary ed. 1972).

**34.** *E. g., Walder v. United States, supra* note 32; *United States v. Townes,* 512 F.2d 1057, 1059 (6th Cir. 1975).

**35.** *Michelson v. United States,* 335 U.S. 469, 479, 69 S.Ct. 213, 220, 93 L.Ed. 168, 175 (1948), quoted in *Johnson v. United States, supra* note

■ There is, however, a fine line between trial conduct spreading new vistas before the inquiring eyes of the jury and that which seeks further to explore previously discovered terrain.[36] The defense in this case hewed closely to that line. The writing itself was already in evidence; had counsel solicited from McMasters no more than a recitation of the notations, no new issues would have been presented the trier of fact. As it was, such a declamation would have been incomprehensible, and so the officer was requested to extend the various abbreviations. James' attorney did inquire as to whether an alternative reading was possible, but a potential for ambiguity was no more than the sparseness of the note fairly suggested. Defense counsel expressed or implied nothing about the circumstances of James' arrest,[37] which, though they may have provided some foundation for Officer McMasters' explication, were under the circumstances no more invited than testimony that his rendering was based on the defendant's criminal record or reputation.

■ If the story of James' arrest was properly before the jury, therefore, it must be by virtue of Rule 404(b) of the Federal Rules of Evidence, which states:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

As illuminated by its legislative history,[38] that rule countenances admission of "bad

---

31, 120 U.S.App.D.C. at 71, 344 F.2d at 165. Cf. *United States v. Lewis, supra* note 33.

**36.** Compare, *e. g., United States v. McCoy*, 515 F.2d 962, 964 (5th Cir. 1975), *cert. denied*, 423 U.S. 1059, 96 S.Ct. 795, 46 L.Ed.2d 649 (1976), with *United States v. Johnson*, 495 F.2d 242, 244–245 (10th Cir. 1974). In *McCoy*, a prosecution for illegal possession of a firearm, the defense sought "to create the idea that the revolver in question had been purchased by the defendant's wife for her protection." 515 F.2d at 964. To negate the theory, the Government was allowed to present seven otherwise inadmissible firearms found in the defendant's home. In *Johnson*, on the other hand, the defendant had said he had "nowhere on [his] record . . . any indication" of narcotics violations. 495 F.2d at 245. This the court said, might have justified further testimony regarding his "*criminal record* in relation to dangerous drugs" *id.* (emphasis in original), but it did not open the door to testimony that he had been present in a room in which narcotics had been discovered, since "there [was no] evidence of a sale of drugs or any other unlawful act by" the defendant. *Id.* And compare *Walder v. United States, supra* note 32 (defendant's denial that he ever possessed narcotics opens door to illegally-seized evidence), with *Agnello v. United States*, 269 U.S. 20, 46 S.Ct. 4, 70 L.Ed. 145 (1925) (defendant's testimony that "he received the packages . . . but . . . did not know their contents [to be] narcotics", *id.* at 29, 46 S.Ct. at 5, 70 L.Ed. at 148, and his denial on cross-examination that he had ever seen narcotics, does not open the door to rebuttal use of narcotics seized from his house, since he "was not asked and did not testify concerning" those narcotics. *Id.* at 35,

46 S.Ct. at 7, 70 L.Ed. at 150. See also *White v. United States*, 121 U.S.App.D.C. 287, 349 F.2d 965 (1965); *Johnson v. United States, supra* note 31; *Gonzales v. Beto*, 266 F.Supp. 751, 753 (W.D.Tex.1967), *aff'd sub nom. Texas v. Gonzales*, 388 F.2d 145 (5th Cir. 1968).

**37.** Nor did it seek selectively to elicit facts about the arrest, in which case, of course, the prosecution would have been free to illuminate its other aspects. *Cf. United States v. Coppola*, 526 F.2d 764, 771–772 (10th Cir. 1975). See also *United States v. Bass*, 175 U.S.App.D.C. 282, 287–288, 535 F.2d 110, 115–116 (1976).

**38.** The March, 1971, Advisory Committee draft of Rule 404(b) was identical to the final version. The Supreme Court's submission of the proposed rules to Congress substituted "[t]his subdivision does not exclude the evidence when offered" in place of "it may, however, be admissible for other purposes." Communication from Chief Justice of the United States on Rules on Evidence, House Doc. No. 93–46, 93d Cong., 1st Sess. 7 (1973). The Advisory Committee notes included in this submission shed no light on the reason for this change, see *id.* at 68, but the House subcommittee determined that it "preferred the 1971 formulation as placing greater emphasis on admissibility than did the final [Supreme] Court version," and so amended the Rule. House Comm. on the Judiciary, Committee Print on Federal Rules of Evidence, H.R. 5463, as amended by the Subcomm. on Criminal Justice 10 (1973). See H.R. Rep.No.93–650, 93d Cong., 1st Sess. 7 (1973). Several parties, including the Department of

acts" evidence that is relevant to any material issue in the case [39] except to show the likelihood that, having once fallen into sin, a second slip is likely.[40] Only one other condition is imposed on the proponent of such evidence: "its probative virtues must outweigh its prejudicial proclivities" [41] in order to satisfy the strictures of Rule 403.[42] To determine the admissibility of Officer McMasters' narrative regarding James' arrest, then, we must ascertain first the use to which it might logically have been put and next the balance that possibly could be struck between its probative value in that role and its inflammatory impact.

 The essential elements of the offense with which James' was charged [43]

were the (a) knowing (b) possession of heroin with (c) intent to distribute it.[44] These were the only *facta probanda* [45]—facts in issue—in the case, for James raised no affirmative defenses. The circumstances of his arrest suggest little about whether he had heroin in his jacket sixteen days earlier, unless the impermissible inference be drawn that he had been associated with the drug once—during passage through the third story window—so it probably was not his first encounter with that evil. Nor does it prove very much about his pharmacological expertise, for the drugs discovered on November 20—the date of the raid—were, so far as the record reveals, never linked to

---

Justice and the American Bar Association, expressed concern that the 1971 draft implicitly bestowed on trial judges discretion to exclude "bad acts" evidence for reasons unspecified in any other rules. See, *e. g., Rules of Evidence (Supplement), Hearings on H.R. 5463 Before the Subcomm. on Criminal Justice of the House Comm. on the Judiciary*, 93d Cong., 1st Sess. (Serial No. 2 1973) at 269 (statement of Prof. Richard Field); *id.* at 344 (statement of American Bar Ass'n); *Rules of Evidence (H.R. 5463), Hearings on H.R. 5463 Before the Senate Comm. on the Judiciary*, 93d Cong., 2d Sess. 123 (1974) (statement of Assistant Attorney General Rakestraw). Congress' response is contained in the Senate Judiciary Committee's report:

Although your committee sees no necessity in amending the rule itself, it anticipates that the use of the discretionary word "may" . . . is not intended to confer any arbitrary discretion on the trial judge. Rather, it is anticipated that with respect to permissible uses for ["bad acts"] evidence, the trial judge may exclude it only on the basis of those considerations set forth in Rule 403

. . . . .
S.Rep.No.93–1277, 93d Cong., 2d Sess. 24–25 (1974), U.S.Code Cong. & Admin.News 1974, pp. 7051, 7071. This has led Judge Weinstein, a member of the Advisory Committee that drafted the rules, to opine that "[o]nly one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect is more likely than men generally to have committed the act in question." 2 J. Weinstein & M. Berger, Evidence ¶ 404[08] at 40 (1975).

39. If, however, the "issue" is the credibility of a witness, the more detailed strictures of Rules 608(b) and 609 govern the admissibility of evidence of specific acts by the witness. See generally *United States v. Smith*, No. 75–1920 (D.C.Cir. Dec. 17, 1976), at 16–17.

40. See note 38 *supra.*

41. *Bradley v. United States,* 140 U.S.App.D.C. 7, 13, 433 F.2d 1113, 1119 (1969).

42. Fed.R.Evid. 403:

Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

The applicability of Rule 403 to evidence described in Rule 404 is confirmed not only by the Advisory Committee's notes, see Communication, *supra* note 38, at 68, but also by the Senate Report, quoted in pertinent part *supra* note 38.

43. 21 U.S.C. § 841(a) (1970) provides that, with exceptions not relevant here, it is unlawful "for any person knowingly or intentionally—(1) to . . . possess with intent to manufacture, distribute, or dispense a controlled substance . . . ," such as heroin.

44. See, *e. g., Brooke v. United States,* 128 U.S. App.D.C. 19, 24–25, 385 F.2d 279, 284–285 (1967). So the trial judge instructed the jury here. Tr. IV/68–70. See also *Direct Sales Co. v. United States,* 319 U.S. 703, 710–712, 63 S.Ct. 1265, 1269–1270, 87 L.Ed. 1674, 1681–1682 (1943).

45. See Stone, *The Rule of Exclusion of Similar Facts Evidence: America,* 51 Harv.L.Rev. 988, 1026 n. 190 (1938). *Facta probanda* stand in contrast with *facta probantia*—"probative facts"—such as motive, from which inferences regarding facts in issue may be drawn.

him. In any event, there was no dispute about whether he would know heroin if he saw it.[46]

 The issue thus resolves itself into whether James' presence in an apartment in which were found substantial quantities of heroin is probative of an intent to distribute other heroin sixteen days earlier. Granting that a person found in that situation might be more likely so to contemplate,[47] such an inference is so weak as to bring into serious question whether its contribution to the accuracy of the trial process outweighed the likelihood that its dramatic flavor would derange it.[48]

 Evidence of a prior crime "is always . . . prejudicial to a defendant. It diverts the attention of the jury from the question of the defendant's responsibility for the crime charged to the improper issue of his bad character."[49] Particularly is that true here,[50] where testimony of subsequent intimacy with narcotics is aggravated by the addition of the sordid incidentals of that relationship. Officer McMasters' account included damaging double hearsay relating to narcotics sales; it was freighted with guns, violent action and a wanted man. In the wake of, and predicated upon, this scenario the jury was exposed not only to James' attempt to explain his role, but also to a reprise of the officer's story "in

**46.** Cf. 2 J. Weinstein & M. Berger, Evidence ¶ 404[10] at 67 n. 4 (1975), citing C. McCormick, Evidence § 157 at 331 (1954) ("the customary principle that [prior crimes] evidence may not be introduced on issues which are not contested"). This principle has been espoused by nearly all of the courts of appeals. E. g., Bradley v. United States, supra note 41, 140 U.S.App.D.C. at 13–14, 433 F.2d at 1119–1120, citing Billings v. United States, 42 App.D.C. 413, 415 (1914); United States v. Brettholz, 485 F.2d 483, 487 (2d Cir. 1973), cert. denied, 415 U.S. 976, 94 S.Ct. 1561, 39 L.Ed.2d 871 (1974), citing C. McCormick, Evidence § 190 at 453 (Cleary ed. 1972); United States v. Cook, 538 F.2d 1000, 1003 (3d Cir. 1976); Lovely v. United States, 169 F.2d 386, 388 (4th Cir. 1948); United States v. Bloom, 538 F.2d 704, 711 (5th Cir. 1976) (Tuttle and Clark, JJ., concurring), citing United States v. Goodwin, 492 F.2d 1141, 1150–1151 (5th Cir. 1974); United States v. Mahar, 519 F.2d 1272, 1273 (6th Cir.), cert. denied, 423 U.S. 1020, 96 S.Ct. 458, 46 L.Ed.2d 393 (1975); United States v. Clemons, 503 F.2d 486, 490 (8th Cir. 1974). See also United States v. Barrett, 539 F.2d 244, 248 (1st Cir. 1976); United States v. Phillips, 375 F.2d 75, 82–83 (7th Cir.), cert. denied, 389 U.S. 834, 88 S.Ct. 40, 19 L.Ed.2d 95 (1967) (dissenting opinion). It is also adverted to in the Advisory Committee notes to Rule 404(b), Communication, supra note 38, at 68.

**47.** The premises on which such an inference rest are:
(1) If James was there, he probably knew of the presence of narcotics, but see United States v. Johnson, supra note 36;
(2) if so, he was probably involved with them;
(3) if so, he was probably buying or selling, but cf. United States v. Partyka, 544 F.2d 345, 347 (8th Cir. 1976); United States v. Masters, 450 F.2d 866, 867 (9th Cir. 1971),

cert. denied, 405 U.S. 1044, 92 S.Ct. 1329, 31 L.Ed.2d 587 (1972);
(4) if so, he probably had the requisite intent on November 20;
(5) if so, he probably had the requisite intent on November 4.
Aside from the attenuation inevitable when one is, as here, multiplying fractions, the degree to which this sort of equation deviates from common sense was suggested in United States v. Masters, supra, 450 F.2d at 867, where one accused of smuggling marijuana was asked if he used it; "[o]n that theory," said the court, "anyone who drank in the Prohibition era should have been a rumrunning suspect."

**48.** See Fed.R.Evid. 403, quoted supra note 42.

**49.** United States v. Phillips, 401 F.2d 301, 305 (7th Cir. 1968). Cf. 1 Underhill, Criminal Evidence § 205 (5th ed. 1956), quoted in Drew v. United States, 118 U.S.App.D.C. 11, 15–16 n. 8, 331 F.2d 85, 89–90 n. 8 (1964):
The large majority of persons of average intelligence are untrained in logical methods of thinking, and are therefore prone to draw illogical and incorrect inferences, and conclusions without adequate foundation. From such persons jurors are selected. They will very naturally believe that a person is guilty of the crime with which he is charged if it is proved to their satisfaction that he has committed a similar offense, or any offense of an equally heinous character. And it cannot be said with truth that this tendency is wholly without reason or justification, as every person can bear testimony from his or her experience that a man who will commit one crime is very liable subsequently to commit another of the same description.

**50.** Cf. United States v. Kearney, 136 U.S.App.D.C. 328, 332, 420 F.2d 170, 174 (1969); United States v. Johnson, supra note 36, 495 F.2d at 245.

rebuttal"; and was informed as well that Burke, the principal defense witness, had been arrested at the same time. Given the slight probative force of this evidence, and its obvious potential for prejudice, we perceive no balance on which it properly could have been admitted.

We are cognizant that "it is not the appellate court's function . . . to speculate upon probable reconviction and decide according to how the speculation comes out"; [51] such judgments diminish the jury's traditional role.[52] Appellate assessment of the harm devolving from errors at trial properly looks rather to the "impact of the thing done wrong on the minds of other men, not on one's own, in the total setting." [53] Our office extends only to determining whether we can say "with fair assurance . . . that the judgment was not substantially swayed by the error," [54] for otherwise the conviction cannot stand. We harbor no such assurance here. The Government's success hinged in several respects upon its ability to convince the jury that James and the witness Burke were mendacious, so that contradictions between their testimony and that of the police might be resolved in favor of the latter. Admission of the testimony concerning James' arrest may crucially have affected the jury's estimate on that score,[55] and that possibility impels us to reverse.

*Reversed and Remanded.*

**51.** *Kotteakos v. United States,* 328 U.S. 750, 763, 66 S.Ct. 1239, 1247, 90 L.Ed. 1557, 1566 (1946). As we ourselves have noted, *Kotteakos* assumed distinctions among errors of the normal sort and errors in contravention of the Constitution or of statute. *United States v. Smith, supra* note 39, at 38. Here, as in *Smith,* we need not consider what might be the proper standard for assessing the harmlessness of transgressions of statutes such as the Federal Rules of Evidence, since such a standard must be at least as rigorous as that adumbrated in *Kotteakos* for deviations from judge-made law.

**52.** *Kotteakos v. United States, supra* note 51, 328 U.S. at 763, 66 S.Ct. at 1247, 90 L.Ed. at 1566. *Cf.* R. Traynor, The Riddle of Harmless Error 30-33 (1970); Field, *Assessing the Harmlessness of Federal Constitutional Error—A Process in Need of a Rationale,* 125 U.Pa.L.Rev. 15, 34-35 (1976).

**53.** *Kotteakos v. United States, supra* note 51, 328 U.S. at 764, 66 S.Ct. at 2347-1248, 90 L.Ed. at 1566; *United States v. Lewis, supra* note 33, 157 U.S.App.D.C. at 57-58, 482 F.2d at 646-647.

**54.** *Kotteakos v. United States, supra* note 51, 328 U.S. at 765, 66 S.Ct. at 1248, 90 L.Ed. at 1567; *United States v. Smith, supra* note 39, at 38; *United States v. Henry,* 174 U.S.App.D.C. 88, 95, 528 F.2d 661, 668 (1976); *United States v. Jackson,* 166 U.S.App.D.C. 166, 175, 509 F.2d 499, 508 (1974).

**55.** See *United States v. Henry, supra* note 54, 174 U.S.App.D.C. at 95, 528 F.2d at 668. *Cf. Virgin Islands v. Toto,* 529 F.2d 278, 283 (3d Cir. 1976):

When [prior crime] evidence . . . reaches the attention of the jury, it is most difficult, if not impossible, to assume continued integrity of the presumption of innocence. A drop of ink cannot be removed from a glass of milk.

See also *United States v. Carter,* 157 U.S.App. D.C. 149, 151, 482 F.2d 738, 740 (1973); R. Traynor, *supra* note 52, at 63-64. This common sense evaluation is supported by such empirical data as are available. See H. Kalven & H. Zeisel, The American Jury 145-148, 160 (1966).