### UNITED STATES of America

v.

### Rita M. LAVELLE, Appellant.

### No. 84–5060.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 7, 1984.

Decided Jan. 18, 1985.

As Amended Jan. 18, 1985.

Mark B. Bierbower and Roy D. Snyder, Jr., Washington, D.C., with whom James J. Bierbower, Washington, D.C., was on the brief, for appellant.

George Allen Carver, Jr., Atty., U.S. Dept. of Justice, Washington, D.C., for appellee.

Before TAMM and EDWARDS, Circuit Judges, and WILKEY,* Senior Circuit Judge.

Opinion for the court filed by Circuit Judge TAMM.

TAMM, Circuit Judge:

The former Assistant Administrator of the Environmental Protection Agency (EPA), Rita M. Lavelle, appeals her conviction for perjury and obstruction of justice. The charges stemmed from testimony given to congressional committees in February 1983 concerning her participation in the administration of the EPA's "Superfund" program in matters affecting her former employer, Aerojet-General Corporation. Ms. Lavelle contends that the trial court erred by 1) improperly restricting cross-examination of EPA attorneys; 2) restricting direct examination of Ms. Lavelle, thereby depriving her of an opportunity to establish her state of mind during the events in question; and 3) admitting unfairly prejudicial evidence of other instances of false testimony. For the reasons expressed below, we affirm the conviction.

## I. BACKGROUND

Prior to her 1982 nomination to become the EPA's Assistant Administrator in charge of the Office of Solid Waste and Emergency Response, Ms. Lavelle was the Director of Communications for the Aerojet Liquid Rocket Company, a division of Aerojet-General Corporation. During the confirmation process, Ms. Lavelle wrote a memorandum to Robert Perry, General Counsel of the EPA, agreeing "not to participate in any EPA matter which specifically involves Aerojet-General or its subsid-

* Senior Circuit Judge Wilkey did not participate in the resolution of this case.

iaries for the term of my appointment with EPA." Trial Transcript (Tr.) 332, 970–71, Joint Appendix (J.A.) 616, 973–74. During her confirmation hearings before the Committee on Environment and Public Works of the United States Senate (the Senate Committee), Ms. Lavelle orally confirmed her written commitment. *Id.*

After Aerojet had been identified as a "responsible party" [1] in connection with the Stringfellow toxic waste disposal site in Riverside County, California, Ms. Lavelle on June 18, 1982 signed a "site specific" recusal, recusing herself from any involvement in the Stringfellow site. On December 14, 1982, Ms. Lavelle signed a "Statement of Certification" (the Statement), which states that she first learned of Aerojet involvement on June 17, 1982 and promptly thereafter recused herself. During Senate hearings on Superfund mismanagement in February 1983, Ms. Lavelle orally confirmed the December 1982 Statement of Certification.

Government witnesses testified at trial that Ms. Lavelle knew of Aerojet involvement in Stringfellow three weeks before she signed the June 18, 1982 "site specific" recusal, directly contradicting her Statement of Certification and sworn testimony. The evidence revealed that Ms. Lavelle learned of Aerojet's involvement at Stringfellow on May 28, at which time a member of her staff suggested that she recuse herself. Tr. 77, 91, 170, 187–88, J.A. 451, 457, 493, 510–11. On May 31, 1982, Ms. Lavelle discussed Aerojet's participation in the Stringfellow site with John Andreason, General Counsel and Vice President of Aerojet. Tr. 420–24, J.A. 706–10. On June 2, 1982, Ms. Lavelle held a weekly staff meeting, during which the Stringfellow matter was discussed. Ms. Lavelle received a status report about Stringfellow and discussed sending out notice letters to the Stringfellow contributors. Tr. 26–28, J.A. 438–40. Ms. Lavelle's confidential assistant testified that on June 3 or 4, Ms. Lavelle told her that Aerojet was a contributor at

the Stringfellow site. Tr. 523–24, J.A. 789–90.

The following week Deborah Dalton, a scientist on Ms. Lavelle's staff, prepared a three-page memorandum outlining what EPA's position should be on the Stringfellow site. Tr. 174, J.A. 497. On June 14, Ms. Lavelle instructed her staff to send an "eyes only" copy of the "Dalton Memorandum" to the regional administrator responsible for the Stringfellow site.

After hearing that Ms. Lavelle had communicated with the regional administrator about the Stringfellow site, Edward Kurent, who had first raised the Aerojet involvement and the need for recusal, suggested to Robert Perry, EPA General Counsel, that a recusal statement be prepared for Ms. Lavelle's signature. Ms. Lavelle signed the recusal statement on June 18, 1982 and thereafter had no involvement with the Stringfellow site.

In late summer 1982, the Subcommittee on Oversight and Investigations of the Committee on Energy and Commerce of the United States House of Representatives (the House Oversight Subcommittee) directed a subpoena to Michael Brown, an EPA staff attorney, requesting all documents relating to the Stringfellow matter. In the course of sifting through documents, Mr. Brown found the June 14, 1982 Dalton Memorandum. Because the Memorandum suggested that Ms. Lavelle might have violated her March 1982 promise to the Senate Committee not to participate in matters affecting Aerojet-General, Mr. Brown recommended to Mr. Perry, his superior, that the document be forwarded to the Subcommittee.

Mr. Perry then scheduled a meeting with EPA Administrator Anne Burford, EPA Chief of Staff John Daniel, and Ms. Lavelle. Mr. Perry began the meeting by telling Ms. Burford that his staff had uncovered a document that indicated that Ms. Lavelle may have violated her March 1982 recusal. Ms. Lavelle defended her actions

---

**1.** A "responsible party" is defined by the EPA as a person or organization identified by the EPA as being actually or potentially responsible for toxic waste as a disposal site.

by noting that the Dalton Memorandum predated her June 18 "site-specific" recusal. Ms. Burford directed that the memorandum be forwarded to Congress along with an affidavit from Ms. Lavelle explaining her involvement in the Stringfellow site.

Mr. Daniel, Mr. Perry, and Ms. Lavelle left the meeting and immediately thereafter drafted a "Statement of Certification," which Ms. Lavelle signed under oath.[2] The Statement said in part:

At that time, [the evening of June 17] for the *first* time, I was told that an Aerojet-General subsidiary was cited as one of the possible responsible parties. I immediately left the briefing and executed a recusal statement.

J.A. 1091 (emphasis in original). The Statement and the Dalton Memorandum were forwarded to the House Oversight Subcommittee. Counts One and Two of the indictment were predicated upon the falsity of this Statement.[3]

On February 23, 1983, Ms. Lavelle, in testimony under oath before the Senate Committee, substantially reaffirmed her position as articulated in the Statement of Certification:

I found out Thursday night [June 17, 1982] for the first time that Aerojet was one of the many companies who had dumped at this site, and then I recused myself according to my commitment to this committee.

\* \* \* \* \* \*

... because of a briefing Thursday evening, a late briefing where I was for the first time presented with the list of responsible parties ... I immediately recused myself ....

\* \* \* \* \* \*

um hum. [In response to a question, 'and you recused yourself on Friday the 18th, immediately upon learning of it; is that correct?']

Count Three of the indictment was predicated upon the falsity of this testimony.

On February 24, 1983, Ms. Lavelle gave substantially similar testimony before the House Oversight Subcommittee:

I had no knowledge whatsoever that Aerojet-General's, one of Aerojet-General's subsidiaries, would be one of the 250 universe [potential disposers] until the evening, Thursday evening—I was looking for the date—I believe it is the 17th ... The 17th. Thursday evening, is

**2.** There is conflicting testimony as to the authorship of the "Statement of Certification." In her affidavit to the trial court, Ms. Lavelle stated that it had been drafted by Michael Brown. Joint Appendix (J.A.) 81. On cross-examination, Ms. Lavelle stated that it was drafted by Gerald Yamada. Trial Transcript (Tr.) 478, J.A. 981. For his part, Mr. Brown testified that he did not prepare the Statement and did not know who did. Tr. 328, J.A. 622. At any rate, Ms. Lavelle was given the opportunity to change the dates on the Statement. She testified on cross-examination that "no one made [her] say that," Tr. 979, J.A. 982, and that she put in the Statement just what she wanted to. Tr. 978, J.A. 981.

**3.** Count One alleged that the Statement of Certification comprised a false statement in violation of 18 U.S.C. § 1001 (1982), which states:

Whoever, in any matter within the jurisdiction of any department or agency of the United States knowingly and willfully falsifies, conceals or covers up by any trick, scheme, or device a material fact, or makes any false, fictitious or fraudulent statements or repre-

sentations, or makes or uses any false writing or document knowing the same to contain any false, fictitious or fraudulent statement or entry, shall be fined not more than $10,000 or imprisoned not more than five years, or both.

Count Two alleged that Ms. Lavelle obstructed the congressional committee by causing the Statement to be sent to that committee in violation of 18 U.S.C. § 1505 (1982), which states in relevant part:

Whoever corruptly, or by threats or force, or by any threatening letter or communication influences, obstructs, or impedes or endeavors to influence, obstruct, or impede the due and proper administration of the law under which any pending proceeding is being had before any department or agency of the United States, or the due and proper exercise of the power of inquiry under which any inquiry or investigation is being had by either House, or any committee of either House or any joint committee of the Congress—

Shall be fined not more than $5,000 or imprisoned not more than five years, or both.

when for the first time I saw a list of disposers ... I left the meeting and my staff prepared a letter of recusal which I signed the next morning ....

\* \* \* \* \* \*

I became aware of the alleged Aerojet connection the Thursday evening, June 17th when I recused myself ....

That is correct. [In response to the question, 'And it was not until that time that you knew of any involvement of your company?']

Count Four of the indictment was predicated upon the falsity of this testimony.[4]

After a jury trial, Ms. Lavelle was found guilty of four of the five counts brought against her. She was sentenced to six months in prison and fined $10,000.

## II. LIMITATION OF CROSS-EXAMINATION OF EPA ATTORNEYS

■ Ms. Lavelle claims that the trial court erroneously denied her an opportunity to show a "set up," attorney misconduct, and bias during cross-examination of EPA attorneys. Although stated in broad terms, Ms. Lavelle cites only one instance in which cross-examination of EPA attorneys was limited. During cross-examination of Michael Brown, at relevant times one of the three top EPA attorneys, defense counsel tried to ask whether he was familiar with the Code of Professional Responsibility. The trial court sustained the government's objection, ruling that the question was beyond the scope of direct examination and irrelevant.

Ms. Lavelle, however, has never identified what she considers to be the "set up" involved. She does not allege that Brown or the other EPA attorneys singled her out as an EPA official deserving prosecution. She does not raise an entrapment defense. Moreover, her vague allegations that she was "duped" into signing the Statement of Certification is directly contradicted by her own testimony. In an affidavit to the trial court, Ms. Lavelle swore that she still believed that the Statement was true. During cross-examination, Ms. Lavelle stated she stood by the Statement as an accurate account of the events as she understood them at the time she signed the Statement.[5] It is, therefore, difficult to conceive how Ms. Lavelle could have been duped into signing a statement which, after almost two years of cool reflection, she still believes to be true.

This leaves Ms. Lavelle's contention that the inquiry concerning the Code of Professional Responsibility was designed to impeach the testimony of the EPA attorneys. On cross-examination,[6] the defense tried to

---

4. Counts Three and Four alleged that Ms. Lavelle committed perjury in her testimony to the Senate Committee and the House Oversight Subcommittee, respectively, in violation of 18 U.S.C. § 1621 (1982), which provides

Whoever—

(1) having taken an oath before a competent tribunal, officer, or person, in any case in which a law of the United States authorizes an oath to be administered, that he will testify, declare, depose, or certify truly, or that any written testimony, declaration, deposition, or certificate by him subscribed, is true, willfully and contrary to such oath states or subscribes any material matter which he does not believe to be true ...

is guilty of perjury and shall, except as otherwise expressly provided by law, be fined not more than $2,000 or imprisoned not more than five years, or both. This section is applicable whether the statement or subscription is made within or without the United States.

5. In an affidavit to the trial court, Ms. Lavelle stated that she considered "this statement to be a legal document, prepared and reviewed by my legal counsel, based on information presented in confidence by me, which at that time I believed to be true to the best of my knowledge and belief, and which I still believe to be true to the best of my knowledge and belief." J.A. 81. During cross-examination of Ms. Lavelle, the following colloquy concerning the Statement of Certification took place:

Q. [by the government]: But no one made you say that. That is your position, isn't it?
A. [by Ms. Lavelle]: It's a pretty good statement of the position, yes.
Tr. 979, J.A. 982.

6. The direct examination of Brown was limited to his discovery in early December 1982 of the "Dalton Memorandum" which indicated that Ms. Lavelle might have dealt improperly with a situation in which she had recused herself. Brown's subsequent discussion with Robert Perry about the memorandum led to the December 17 meeting between Ms. Lavelle, Ms. Burford, and Mr. Perry. During the meeting, Ms. Burford requested that Ms. Lavelle document her

impeach Brown by eliciting testimony about his friendship with Mr. Perry and his personal contact with people on the House Committee. Brown testified, over the prosecution's objections, that during Mr. Perry's absences he acted as the chief ethics officer for the EPA. After the defense retraced much of his testimony, the following colloquy took place:

Q: [By Defense Counsel] Let's go back to your duties as ethics officer. Where did you attend law school?

A: [By Mr. Brown] Saint Mary's University, University of Virginia and Georgetown University Law Center.

Q: And I assume you studied the Code of Responsibility there did you not?

A: Yes.

Q: And you are aware of the Code of Professional Responsibility?

A: As a general code, I would hate to have to recite any particular specific section thereof.

Q: Well, as ethics officer assistant, you examined it from time to time, didn't you?

[By the Prosecution] Objection, your honor. Outside the scope and irrelevant.

The Court: Clearly outside the scope.

[By the Defense Counsel]

Q: Are you familiar with—let me try this again, your honor.

The Court: As I said, it is clearly outside the scope of direct examination.

At which time the parties approached the bench:

(At the Bench)

Mr. Bierbower: Your honor, I just want to ask him about one specific provision of the code to see if he is aware of it.

The Court: Which Code?

Mr. Bierbower: The one in effect in the District of Columbia. He is a member of the bar here.

Mr. Hendricks: Your honor, what counsel is doing is trying to put his case in through our witness. If he wants to call the witness, he is free to do it.

The Court: He certainly is. But you are talking about the Code of Professional Responsibility?

Mr. Bierbower: Yes.

The Court: It has absolutely nothing to do with this case, certainly not on cross-examination.

Tr. 340–42, J.A. 634–36.

 Ms. Lavelle contends that the excluded evidence precluded her from developing "the possibility that the testimony of certain EPA attorneys may have been motivated by a desire to avoid prosecution and to cover up or obscure violations of professional ethics." Brief for Appellant at 49. This is not the explanation for the question defense counsel offered at trial. At the bench conference, defense counsel's only comment was, "I just want to ask him about one specific provision of the Code to see if he is aware of it." Federal Rule of Evidence 103(a)(2), however, limits reversible error to those instances in which "the substance of the evidence was made known to the court by offer or was apparent from the context within which questions were asked." As the court stated in *Cheek v. Bates*, 615 F.2d 559, 563 (1st Cir.), *cert. denied*, 446 U.S. 944, 100 S.Ct. 2172, 64 L.Ed.2d 800 (1980), "[r]eversal for a denial of the right to show bias on cross-examination ... requires both an affirmative assertion of that right and a knowing decision by the judge to deny or limit it." [7] Defense counsel's comment at the bench conference did not even remotely constitute "an affirmative assertion" of the right to show bias.

Ms. Lavelle contends that the substance of the line of questioning about bias was made known to the trial court through pre-

participation in the Stringfellow site. Tr. 350, J.A. 642. Ms. Lavelle's documentation, the Statement of Certification, is the basis for Counts One and Two of the indictment.

**7.** *See also United States v. Winkle*, 587 F.2d 705, 710 (5th Cir.) (inadequate offer of proof barred

consideration on appeal), *cert. denied*, 444 U.S. 827, 100 S.Ct. 51, 62 L.Ed.2d 34 (1979); *United States v. Muncy*, 526 F.2d 1261, 1263 (5th Cir. 1976) (lack of offer of proof resulted in refusal to consider propriety of exclusion on appeal).

trial motions and the context of the interrogation. Even if we accepted this contention, her theory of bias is entirely illogical. Ms. Lavelle states that the testimony of the EPA attorneys given at trial itself "demonstrated" violations of professional ethics because the attorneys forwarded the Statement to Congress knowing it contained substantial inaccuracies.[8] At the same time, she maintains that their testimony was "motivated by a desire to cover up or obscure violations of professional ethics," presumably their knowledge of the Statement's falsity. If the EPA attorneys in fact had been motivated by a desire to cover up their own ethical misconduct, however, it is difficult to see why they would have testified that they knew the Statement to be false when they submitted it to Congress. If we accept Ms. Lavelle's bias theory, the attorneys should have been eager to present evidence that tended to exculpate Ms. Lavelle, and hence themselves, from any wrongdoing. Contrary to Ms. Lavelle's assertion that the attorneys were biased against her, all would appear to have a common interest—under her theory—in establishing, insofar as possible, the truthfulness of the Statement.

Moreover, even if we ignore the logical inconsistencies of her theory of bias, the defense had ample opportunity to present to the jury the facts upon which the propriety or impropriety of the EPA attorneys' role in the preparation of the Statement of Certification could be assessed. In her brief to this court, Ms. Lavelle, after exhaustively citing references to the trial record, claims that "[t]he above-described facts ... demonstrate a conflict of interest and go to the very heart of the credibility of Mr. Yamada and Mr. Brown as prosecution witnesses." Brief for Appellant at 40. By Ms. Lavelle's own account, therefore, the jury was exposed to the "facts" upon which her claims of bias were based.[9] Once unraveled, therefore, Ms. Lavelle's argument on appeal reflects discontent with the jury's factual findings but articulates no basis for reversal.

### III. LIMITATION OF DIRECT EXAMINATION OF MS. LAVELLE

■ Ms. Lavelle claims throughout her brief that the trial court impermissibly restricted her own direct examination. In one instance, the court excluded as "totally irrelevant" a question as to whether anyone ever suggested to Ms. Lavelle that she hire her own lawyer. Tr. 899, J.A. 946. Even if the question were relevant,[10] however, no harm resulted from its exclusion. Moments later Ms. Lavelle testified that she "saw no reason" to use her own lawyer: "if you tell the truth, you don't get in trouble and there's no reason to hire a lawyer." Tr. 900, J.A. 947. Furthermore, cross-examination of Mr. Brown, Ms. Daniel, and Mr. Yamada revealed that none of them recommended that Ms. Lavelle hire

---

**8.** The question concerning the Code of Professional Responsibility, however, was posed only to Mr. Brown and not to the other EPA attorneys, Mr. Yamada and Mr. Perry, who had more direct contact with Ms. Lavelle and were in a better position to advise Ms. Lavelle as to whether she should retain her own attorney.

**9.** In her brief to this court, Ms. Lavelle asks: Why did Mr. Perry, Mr. Yamada, Mr. Brown and Mr. Kurent withhold from Ms. Lavelle information which contradicted her version of the Stringfellow recusal? ... [W]hy did Mr. Perry and Mr. Yamada, the two top E.P.A. attorneys, forward to Congress a statement of material facts which they knew contained substantial inconsistencies with what they knew to be the facts?

Brief for Appellant at 43–44. Evidence forming the premises of these questions was presented to

the jury. The jury plainly did not make any inferences from these facts that disturbed a finding that Ms. Lavelle knowingly made materially incorrect statements.

**10.** This line of inquiry seemed to be designed to show that, had Ms. Lavelle had adequate legal counsel, she would not have signed the Statement of Certification or given false testimony. *See* Brief for Appellant at 50 ("As a non-lawyer confronted with powerful agency attorneys, she was not informed of the import of her actions or the veracity of her recollection."). While this may be true, the statute under which Ms. Lavelle was convicted does not require that the defendant knowingly deceive *despite* adequate legal counsel. It would be novel indeed to condition criminal culpability upon the adequacy of legal counsel prior to commission of a particular offense.

her own lawyer. Tr. 342, 357, 408, J.A. 636, 649, 696.

■ Second, appellant claims that the trial court erred by sustaining a relevancy objection to the following question posed to Ms. Lavelle: "Tell the jury, if you can, the status of relations between your office and Mr. Perry's office in the period from July to August 1982." Again, even if the question was not overbroad, excluding it resulted in no harm. After the bench conference, the court allowed a similar question— "Tell the jury what your relationship was with Mr. Perry at that time?"—to which Ms. Lavelle fully responded. J.A. at 929.

■ Finally, Ms. Lavelle claims that the trial court erred by sustaining "repeated objections" to defense counsel's attempts to introduce evidence concerning Ms. Lavelle's state of mind following her dismissal from the agency. Brief for Appellant at 72–77. For example, defense counsel asked Ms. Lavelle to describe what happened shortly after her firing "with respect to your life, and your telephone, and your whole being?" Tr. 938, J.A. 959. Although narrowed somewhat by the reference to Ms. Lavelle's telephone, a question encompassing Ms. Lavelle's "whole being" strikes us as necessarily overbroad. Although the federal rules do not require each question to be framed with model clarity, we cannot fault the trial court for sustaining the government's objection. We conclude, therefore, that the trial court committed no reversible error in limiting the direct examination of Ms. Lavelle.

## IV. OTHER BAD ACTS EVIDENCE

### A. *Introduction*

Ms. Lavelle contends that the trial court committed reversible error by admitting evidence of "other bad acts" introduced by the government at the end of the presentation of its case-in-chief. Since one of Ms. Lavelle's claims of error is the insufficiency of the proof of the other bad acts, we shall discuss the evidence in some detail. The government introduced two other instances in which Ms. Lavelle gave false testimony. The first instance of false testimony arose out of an April 8, 1982 meeting between Ms. Lavelle, Norman Nosenchuck, Director of the Division of Solid and Hazardous Waste for the New York State Department of Environmental Conservation, and Jacqueline Rams, former technical director of the Association of State and Territorial Solid Waste Management Officials. Mr. Nosenchuck and Ms. Rams testified that Ms. Lavelle angrily complained that her confirmation had almost been held up because of a letter Mr. Nosenchuck had sent to Senator Moynihan about the Love Canal waste disposal problem. Videotaped segments of February 1983 Senate Committee hearings, however, showed Ms. Lavelle testifying that the letter did not hold up her confirmation and that she never told Mr. Nosenchuck that his letter held up her confirmation. J.A. 1152, 1155–56.

The second instance of false testimony occurred during Ms. Lavelle's February 1983 testimony before the Senate Committee and the House Oversight Subcommittee. The government showed video tapes of Ms. Lavelle testifying to both committees that she had voluntarily turned over her 1982 appointment calendars to the committees. Ms. Lavelle also testified that she had not been given access to her records for the purposes of preparing for the testimony and that no one had delivered any documents from her office to her following her termination with the agency. J.A. 1145. Susan Baldyga, former Special Assistant to Ms. Lavelle, and Henrietta Janiszewski, former Confidential Assistant to Ms. Lavelle, testified that, in addition to the two calendars that had been turned over to the congressional committees, Ms. Lavelle kept a third calendar. That calendar included information about Ms. Lavelle's official responsibilities as well as her personal engagements. Tr. 503, 526, J.A. 769, 792. Ms. Janiszewski testified that certain "industry-type appointments" were to be posted on Ms. Lavelle's calendar, but not on the two "government" calendars kept by Ms. Lavelle's secretaries. Tr. 527, J.A. 793.

Ms. Baldyga also testified that on the day Ms. Lavelle was fired, February 4, 1983, she and Ms. Janiszewski were ordered by Mr. Wood, Ms. Lavelle's chief of staff, to take specified documents out of Ms. Lavelle's office. The documents were loaded into three briefcases and put into the trunk of Ms. Baldyga's car. That evening, in a meeting with Ms. Lavelle in the latter's office, Ms. Baldyga told Ms. Lavelle that she had taken the documents. The next day, Ms. Baldyga returned to Ms. Lavelle's office and took some of Ms. Lavelle's rolodex cards, binders from Ms. Lavelle's credenza, and loose papers from Ms. Lavelle's desk and conference table. That evening, after dinner with Ms. Lavelle and other EPA staff, Ms. Baldyga transferred the documents from her car to the car of Mr. Ingold, former Director of Public Relations for Ms. Lavelle. Ms. Lavelle watched this transaction. The documents and briefcases were later seen by both Ms. Baldyga and Ms. Janiszewski at Ms. Lavelle's apartment.

Ms. Lavelle claims that the evidence of the other bad acts was insufficient to prove that these acts were actually committed, that the probative value of the evidence was substantially outweighed by its prejudicial impact, and that the trial court mishandled the evidence in several respects.

**B. Legal Standards for Determining the Admissibility of Other Acts Evidence**

A fundamental tenet in our criminal jurisprudence is that a jury should not premise its verdict upon a general evaluation of the defendant's character but rather upon an assessment of the evidence relevant to the particular crime with which the defendant is presently charged. *United States v. Foskey*, 636 F.2d 517, 523 (D.C. Cir.1980) (" 'a defendant must be tried for what he did, not for who he is' " (quoting *United States v. Myers*, 550 F.2d 1036, 1044 (5th Cir.1977), *cert. denied*, 439 U.S. 847, 99 S.Ct. 147, 58 L.Ed.2d 149 (1978)). For this reason, Federal Rule of Evidence 404(b) establishes a broad prohibition against admission of "other crimes, wrongs, or acts ... to prove the character of a person in order to show that he acted in conformity therewith." At the same time, the rule recognizes that bad acts evidence can legitimately be introduced for purposes other than to prove the defendant's bad character, such as to prove the defendant's "motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.*[11] Introducing evidence of prior bad acts for a legitimate purpose, however, does not automatically cleanse the evidence of its unique quality of unfairly prejudicing the rights of the accused. *See United States v. Shelton*, 628 F.2d 54, 56 (D.C.Cir.1980); *United States v. James*, 555 F.2d 992, 999 (D.C.Cir. 1977).[12] Therefore, under Rule 403 the probative value of the evidence must not be substantially outweighed by the unique dangers of unfair prejudice associated with evidence of other bad acts. *See United States v. Moore*, 732 F.2d 983 (D.C.Cir.

**11.** As this court stated in *United States v. James*, 555 F.2d 992, 999 (D.C.Cir.1977), the "rule countenances admission of 'bad acts' evidence that is relevant to any material issue in the case except to show the likelihood that, having once fallen into sin, a second slip is likely." *See also* 2 J. Weinstein & M. Berger, Evidence § 404[08], at 404–44, 45 (1982) ("Only one series of evidential hypotheses is forbidden in criminal cases by Rule 404: a man who commits a crime probably has a defect of character; a man with such a defect of character is more likely than men generally to have committed the act in question.").

**12.** In *United States v. Shelton*, 628 F.2d 54, 56 (D.C.Cir.1980), this court stated: "These carefully delineated rules exist because of the enor-

mous danger of prejudice to the defendant that evidence of other crimes creates. We have recognized before that juries are prone to draw illogical and incorrect inferences from such evidence." *See also United States v. Beechum*, 582 F.2d 898, 920 (5th Cir.1978) (en banc) (Goldberg, J., dissenting) ("[Rule 404(b)'s] purpose is to caution us that extrinsic acts evidence is fraught with dangers of prejudice—extraordinary dangers not presented by other types of evidence."), *cert. denied*, 440 U.S. 920, 99 S.Ct. 1244, 59 L.Ed.2d 472 (1979); C. McCormick, Evidence § 190 at 565 (3d ed. 1984) ("the fact that there is an accepted logical basis for the evidence other than the forbidden one ... may not preclude the jury from relying on a defendant's apparent propensity toward criminal behavior").

1984); *United States v. DeLoach*, 654 F.2d 763 (D.C.Cir.1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981). *See also* Fed.R.Evid. 404 advisory committee note.

### C. *Rule 404(b)*

#### 1. Relevancy to Intent

The government claims that it introduced the prior bad acts evidence to prove Ms. Lavelle's intent in making the false statements. Although Ms. Lavelle has never conceded the falsity of her statements, the intent with which she made the statements has been the primary contested issue in the case. Ms. Lavelle ·contended that she did not intend to deceive Congress. She was confused, under tremendous pressure, and influenced by EPA attorneys who "duped" her into signing the false Statement of Certification. Had she known the Statement to be false, Ms. Lavelle claimed, she neither would have signed the Statement nor relied on the Statement in oral testimony.

To rebut Ms. Lavelle's claims, the government attempted to prove that her false statements were not the product of a confused recollection but rather the result of a calculated effort to vindicate her role in the administration of the EPA by deliberately deceiving Congress. Evidence of Ms. Lavelle's false testimony in other instances was therefore relevant to her specific intent to deceive and not merely evidence of Ms. Lavelle's general bad character. The evidence, therefore, clearly passes the threshold test under rule 404(b). *See United States v. DeLoach*, 654 F.2d 763 (D.C.Cir.1980) (allowing the introduction of prior bad acts evidence to show the intentional filing of false statements), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981); *United States v. Childs*, 598 F.2d 169, 173–74 (D.C.Cir.1979) (allowing the introduction of prior crimes

evidence to show the specific intent to obstruct the carriage of mail). *See also United-ed States v. Ross*, 321 F.2d 61, 67 (2d Cir.) (proper to admit evidence that defendant, charged with securities fraud, who claimed that he had been duped by his employer, had drifted among firms engaged in selling worthless securities), *cert. denied*, 375 U.S. 894, 84 S.Ct. 170, 11 L.Ed.2d 123 (1963).

#### 2. Sufficiency of the Evidence

■ Ms. Lavelle claims for the first time in her Reply Brief that the government's proof of the other bad acts was not "clear and convincing." Reply Brief for Appellant at 18–27. We agree that the relevancy of other bad acts is contingent upon whether the other acts actually occurred, but the government need not prove that the defendant committed the other act "beyond a reasonable doubt." Rather, as this court stated in *United States v. Moore*, 732 F.2d 983, 988 (D.C.Cir.1984), the government must only present "clear and convincing proof to support a jury finding that the bad acts alleged in fact occurred." *But see Beechum*, 582 F.2d 898, 913 (5th Cir.1978) (en banc) (holding that the proper test is "whether the evidence would support a finding").

■ To prove that Ms. Lavelle lied both to Mr. Nosenchuck and to the Senate Committee, the government presented two witnesses who directly contradicted Ms. Lavelle's testimony to Congress. The events surrounding the meeting with Mr. Nosenchuck were sufficient for a jury to conclude that Ms. Lavelle did not make an innocent misstatement, but rather deliberately misrepresented herself.[13] In the second instance, the government presented two witnesses, each of whom testified that Ms. Lavelle had in fact not turned over all of her appointment calendars as she had sworn to Congress. The evidence showed that the sensitive nature of the information

---

**13.** The testimony revealed that Ms. Lavelle intended to harass Mr. Nosenchuck by falsely claiming that his actions delayed her confirmation. Ms. Lavelle sarcastically referred to Mr. Nosenchuck as "Mr. Ambassador," made threat-

ening remarks to him, and instructed him not to communicate with members of Congress without first obtaining her consent. Tr. 475–77, 487–90, J.A. 742–44, 754–57.

kept on Ms. Lavelle's calendar—appointments with representatives of regulated industries—was such that Ms. Lavelle had a motive for keeping the third calendar from Congress. The testimony of Ms. Baldyga and Ms. Janiszewski also established convincingly that Ms. Lavelle had been given documents from her office after she had been fired—directly contradicting her sworn testimony. We therefore conclude that the government met its burden of proving the other bad acts by "clear and convincing" evidence.[14]

### D. *Rule 403 Balancing Test*

Ms. Lavelle argues that the evidence of other bad acts, even if relevant to the issue of intent, was substantially outweighed by its unfairly prejudicial effect and therefore should have been excluded under Rule 403. Ms. Lavelle also claims that the court erred by not providing an on-the-record evaluation of the Rule 403 test. In reviewing these claims, we note that "the balancing contemplated by Rule 403 is a matter within the discretion of the trial court and should be overturned on appeal only in cases of abuse of discretion." *Foskey*, 636 F.2d at 525.

#### 1. Probative Value

In assessing the probative value of other acts evidence, this court has considered, *inter alia*, the similarity of the bad act with the charged offense, *see, e.g., United States v. Moore*, 732 F.2d 983, 989 (D.C.Cir. 1984) (probative value increases with similarity of offenses),[15] the time separating the two events, *see, e.g., United States v. Foskey*, 636 F.2d 517, 525 (D.C.Cir.1980) (probative value decreases with the time separating the two events), and the prosecution's need for the evidence, *see, e.g., United States v. DeLoach*, 654 F.2d 763, 769 (D.C.Cir.1980), *cert. denied*, 450 U.S. 933, 101 S.Ct. 1395, 67 L.Ed.2d 366 (1981).

The evidence of the other bad acts in this case documented deeds extremely similar to those forming the basis of Ms. Lavelle's indictment: both involved misrepresentations concerning the propriety of her conduct as the Assistant Administrator of the EPA. Second, the time separating the events charged in the indictment and the other bad acts was minimal: all involved the same congressional hearings.

Finally, as discussed above, the other bad acts evidence was offered to establish a critical and seriously contested issue in the trial—Ms. Lavelle's specific intent to deceive. Direct evidence was unavailable to prove her subjective intent; evidence of other acts of perjury was necessary to rebut Ms. Lavelle's claim that her statements were innocent mistakes.

#### 2. Unfair Prejudice

■ We cannot find that the probative value of this evidence was substantially

---

**14.** It is the strength of the evidence linking Ms. Lavelle to the other bad acts that makes her reliance on *United States v. James*, 555 F.2d 992 (D.C.Cir.1977), misplaced. In *James*, the defendant, charged with possession of heroin with the intent to distribute, challenged the government's introduction of evidence of a subsequent arrest. The issue in *James* was whether the defendant's "presence in an apartment in which were found substantial quantities of heroin is probative of an intent to distribute other heroin sixteen days earlier." *Id.* at 1000. By not offering proof that the defendant in fact committed any crime that would be relevant to the offenses charged, the government asked the jury to make a series of tenuous inferences: first, that James knew of the presence of heroin in the subsequent arrest; second, that he intended to distribute the heroin. Even if these inferences could be made, the jury still had to make the final inference: that evidence of the subsequent in-

tent to distribute was relevant to the charged crime. Because of the strength of the proof linking Ms. Lavelle to prior acts of deceit, however, the jury in this case is asked only to make the final inference: that is, that the evidence of the prior false statements increases the likelihood that Ms. Lavelle made the statements with the requisite intent to deceive. Furthermore, the government's presentation of the evidence in *James* featured the gratuitous presentation of sordid details of "guns, violent action and a wanted man." *Id.* at 1000. No such dramatic or inflammatory evidence is involved in this case.

**15.** The similarity factor, however, cannot be used uncritically: "The degree of similarity required ... will depend on the evidential hypothesis which is being employed ...." 2 J. Weinstein & M. Berger, Evidence ¶ 404[12], at 404–68 (1982).

outweighed by its prejudicial impact. The unique dangers of prejudice associated with the introduction of evidence of other bad acts include the danger that the jury may punish the defendant for the extrinsic offense and not for the charged offense, the danger that the evidence—though relevant to, for example, intent—will be used by the jury primarily for the impermissible purpose of inferring guilt from a general defect in character, and the danger that the evidence will inflame the jury into reaching an impassioned and irrational verdict.

■■■ Generally, the similarity of the other bad acts evidence to the charged offenses increases the danger that the jury will confuse the issues necessary to convict the defendant. *Beechum,* 582 F.2d at 915 n. 20; 2 D. Louisell & C. Mueller, Federal Evidence § 140, at 120 (1978). In this case, the other bad acts involved offenses extremely similar to the charged offenses. There was little danger, however, that the jury would confuse the offenses. Each "other bad act" involved discrete instances of false testimony that could not easily be confused with the charged offenses. In addition, the government introduced the evidence at the end of its case-in-chief, thereby enabling the jury to consider the probative value of the other bad acts evidence without confusing them with the charged offenses.[16] This is not a case in which the evidence is a mere undocumented record of general misbehavior, designed to paint a vague picture of the defendant as someone who deserves punishment, regardless of whether the particular crime was ever committed. *Compare United States v. Shel-*

*ton,* 628 F.2d 54, 57 (D.C.Cir.1980) ("Where the evidence is presented by innuendo, it is less likely that the jury will guard against manipulation."). Instead, the presentation of the evidence was simple and clear, surrounded by careful limiting instructions.

Moreover, the character of the other bad acts evidence itself was hardly the kind that compels the jury irrationally to convict a defendant because she is a bad character. Video tapes of congressional hearings are unlikely to incite the jury to an irrational decision by their sheer force on human emotions.

Finally, the manner in which the government presented the evidence guarded against unfair prejudice. We have repeatedly recognized that the prosecution can jeopardize a conviction by imprudent use of other bad acts evidence. *See United States v. Foskey,* 636 F.2d 517, 524 n. 6 (D.C.Cir.1980) ("In reviewing the record, we take into account not only the evidence itself, but also the manner in which it was presented to the jury."). In this case, however, the government informed the defense prior to trial that prior bad acts evidence was to be introduced, *see Foskey,* 636 F.2d at 525 n. 8 (suggesting that government attorneys inform defense counsel before trial of intention to introduce evidence of prior bad acts), and avoided making careless references to the prior bad acts evidence in opening statements. *See United States v. DeLoach,* 654 F.2d 763, 772 (D.C. Cir.1980) (Tamm, J., concurring) (criticizing government attorneys for carelessly referencing prior bad acts in opening remarks), *cert. denied,* 450 U.S. 933, 101 S.Ct. 1395,

---

16. Some courts have suggested that the presentation of other crimes evidence should await the conclusion of the defendant's case, when the trial court will best be situated to "balance the probative worth of, and the Government's need for, such testimony against the prejudice to the defendant." *United States v. Benedetto,* 571 F.2d 1246, 1249 (2d Cir.1978); *see also United States v. Jones,* 476 F.2d 533, 537 (D.C.Cir.1973) (per curiam). Indeed, when it is unclear whether the defendant will raise a particular defense, such as entrapment, or concede a particular issue, such as identity, the trial court should exercise its discretion and wait to admit other

bad acts evidence until it is apparent that it will involve a contested issue. In this case, however, it was clear from the outset that Ms. Lavelle would deny that she made the false statements with the requisite intent to deceive. Under such circumstances, the judge, by the completion of the government's case-in-chief, could assess the probative value of the other bad acts evidence. *See United States v. Olsen,* 589 F.2d 351 (8th Cir.1978) (no abuse of discretion to introduce prior crimes evidence prior to defendant's case when defendant's opening statement raised lack of knowledge as a defense), *cert. denied,* 440 U.S. 917, 99 S.Ct. 1237, 59 L.Ed.2d 468 (1979).

67 L.Ed.2d 366 (1981). *See also Grimaldi v. United States,* 606 F.2d 332, 340 n. 9 (1st Cir.) (admonishing government attorneys not to take "unnecessary risk of injecting the danger of irremediable prejudice" by reference in the opening statement to the defendant's prior offenses), *cert. denied,* 444 U.S. 971, 100 S.Ct. 465, 62 L.Ed.2d 386 (1979).

3. Requirement of an on-the-record articulation of the Rule 403 balance.

Ms. Lavelle claims that the trial court's failure to provide an on-the-record articulation of the Rule 403 balancing test warrants a reversal of her conviction.[17] To support her claim, Ms. Lavelle cites *United States v. Robinson,* 700 F.2d 205 (5th Cir. 1983), *cert. denied,* —— U.S. ——, 104 S.Ct. 1003, 79 L.Ed.2d 235 (1984), which held that it was reversible error for the trial court not to make an on-the-record determination that the probative value of the other bad acts evidence outweighs its prejudicial im-

pact. We agree with the Fifth Circuit that written findings assist appellate courts in determining whether the proper analysis was employed in the probative value/prejudicial impact evaluation. *See Foskey,* 636 F.2d at 525 n. 7 ("The trial judge has the responsibility for making sure that the record reflects the balancing of the considerations articulated in Rule 403.").[18] We recognize, however, two important exceptions to this requirement: first, no reversal or remand is warranted unless the trial court refuses to make an on-the-record determination *in response to such a request, see Robinson,* 700 F.2d at 213; second, no reversal or remand is warranted if the "factors upon which the probative value/prejudice evaluations were made are readily apparent from the record, and there is no substantial uncertainty about the correctness of the ruling." *Id.* Both exceptions are applicable to this case. First, at no time did defense counsel request that this determination be made "on-the-record."[19] Second, as our discussion above

---

17. Ms. Lavelle also claims that the trial court erred by not requiring a complete presentation of the evidence of other bad acts outside the hearing of the jury before determining its admissibility. Brief for Appellant at 53. Ms. Lavelle does not cite, nor can we find, any authority supporting this requirement. *See United States v. Moore,* 732 F.2d 983, 986 (D.C.Cir.1984) (affirming conviction when evidence of other bad acts was presented directly to the jury). The government made an adequate proffer of evidence to the trial court prior to the introduction of the evidence. In its trial brief, the government explained fully the other bad acts to be presented. J.A. 199–205. The government again explained the presentation to the court in the bench conference held prior to its introduction. Tr. 5–6, J.A. 433–34. Finally, the judge viewed segments of the video tape presentation prior to making her final admissibility determination. Tr. 440–42. Under the circumstances, we conclude that no reversible error was committed. *See United States v. Bailey,* 505 F.2d 417, 448 (D.C.Cir.1974) (affirming trial court's handling of the evidence given the ultimate correctness of the ruling), *cert. denied,* 420 U.S. 961, 95 S.Ct. 1350, 43 L.Ed.2d 438 (1975).

18. As the court stated in *Robinson:*

An express scaling on-the-record of probative value and prejudice would tend to ensure appropriate consideration at trial of all relevant factors, establish the basis for the court's

ruling, and provide the needed record for proper appellate review. On-the-record findings and conclusions would thus further the efforts of both the trial and appellate court to follow the Rule 404(b) analysis ....

700 F.2d at 213.

We do not address the necessity of on-the-record determinations under Rule 403 *generally.* The requirement of an on-the-record evaluation under Rule 404(b) is compelled by the unique "danger of prejudice to the defendant that evidence of other crimes creates." *United States v. Shelton,* 628 F.2d 54, 56 (D.C.Cir.1980).

19. Before the other bad acts evidence was introduced, the trial court held a bench conference to determine the admissibility of the evidence. Tr. 234–40, J.A. 556–62. Defense counsel argued that the court should consider whether Ms. Lavelle in fact committed the other bad acts, whether the evidence was relevant to anything other than Ms. Lavelle's propensity to commit crimes, and whether the probative value was substantially outweighed by the prejudicial impact. The defense maintained in a somewhat conclusory fashion that the evidence was not relevant to intent or motive, but otherwise articulated no other specific objection to the other acts evidence. The trial court noted that the evidence was not relevant to motive, but rather to intent, and ruled that the evidence was admissible. Defense counsel did not respond. The government asked whether the evidence

indicates, the record clearly reveals that the probative value of the evidence clearly outweighed its minimal prejudicial impact. We therefore conclude that the trial court committed no reversible error in failing to make an on-the-record finding that the prejudicial impact of the evidence was not substantially outweighed by the probative value of the other acts evidence.[20]

For the foregoing reasons, the judgment of the District Court is

*Affirmed.*

MacKinnon, Senior Circuit Judge, dissented and filed opinion.

could be submitted directly to the jury, and the trial court answered affirmatively. The defense counsel was still silent. It was not until the next day of trial that the defense counsel awoke to the prospect of having the evidence presented directly to the jury. The trial court informed the defense that this had indeed been the ruling the day before. Even at this point, however, the defense did not request the judge to make an on-the-record determination of the admissibility of the evidence. Tr. 248–49, J.A. 564–65.

**20.** We have also carefully considered contentions by defense counsel that the trial judge erred by not granting defendant's motion to dismiss the indictment because of a "totality of grand jury abuse" and motion to hold an evidentiary hearing thereon and find those arguments without merit. *See Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958).